**S & G INVESTMENT INC. et al.,**
**Appellants,**

**v.**

**HOME FEDERAL SAVINGS AND**
**LOAN ASSOCIATION et al.**

**No. 72-1625.**

United States Court of Appeals,
District of Columbia Circuit.

Argued Jan. 29, 1974.

Decided Oct. 3, 1974.

---

Hershel Shanks, Washington, D. C., with whom Henry H. Glassie, Washington, D. C., was on the brief, for appellants.

David S. Scrivener, Washington, D. C., with whom Marshall P. Johnson, Washington, D. C., was on the brief for appellee Home Federal Savings & Loan Assn.

Herman Miller, Washington, D. C., was on the brief, for appellee Scheve.

Jacob C. Lish, Washington, D. C., entered an appearance for appellee Bernstein.

Charles Sumner Brown, Washington, D. C., entered an appearance for appellees Francies.

Before LEVENTHAL, MacKINNON and WILKEY, Circuit Judges.

MacKINNON, Circuit Judge:

Appellants S & G Investment, Inc., a Maryland corporation [1] (hereafter "S & G"), brought the instant action as the owner of a residential row brick house at 751–12th Street, S.E., Washington, D.C., which was encumbered by a first deed of trust securing the payment of a note in the original amount of $9,250 held and owned at the time of foreclosure by the Home Federal Savings and Loan Association (hereafter "Home Federal").[2] The suit is against Home Federal and the trustees named in the deed of trust and charges a breach of trust by the trustees of their fiduciary duties in the conduct of the sale foreclosing the lien securing the note held by Home Federal. The primary request for relief is damages against the trustees but the complaint also seeks to have the foreclosure set aside. A third claim alleges that the due date of the unpaid principal of the note was not properly accelerated and that the trustees erred in applying the proceeds of the foreclosure sale to satisfy the principal amount of the indebtedness secured by the first deed of trust. After a very careful analysis of the facts and the law, we are unable to find controlling merit in any of S & G's contentions and hence affirm the decision and judgment of the District Court.[3]

I

On October 26, 1969, appellant S & G, following earlier delinquencies which had been corrected, became three months delinquent in the monthly payments due on a note secured by first deed of trust on the row brick house above referred to. On October 27, 1969, Home Federal, the then owner and holder of the secured note, sent appellant a letter and notice by certified mail, return receipt requested,[4] at the Maryland

---

1. The plaintiff-appellants in this action are S & G Investment, Inc., Myron Golob and Barbara A. Golob. Myron Golob was president of S & G. Between July 1, 1968, and July 1, 1969, Myron Golob was a 50% stockholder in S & G and thereafter he was a 100% stockholder. Mike Golob Associates, Inc. was also a business of Myron Golob. So, for all practical purposes, when S & G is referred to, it refers to all plaintiffs and all appellants (hereinafter referred to as appellants and S & G), except that only the Golobs personally endorsed the note to the Davis Mortgage Company secured by the second trust deed.

2. S & G Investment Company acquired its interest in the property after subsequent conveyances from the original owners and borrowers, David and Sarah G. Mushinsky. S & G acquired its title to the property subject to the encumbrance but without assuming any of the indebtedness.

3. The District Court granted defendants' motion for summary judgment, denied plaintiffs' motion for summary judgment, dismissed the cross-claims of defendants Alvin G. & Margaret Francies (purchasers from the purchaser at the foreclosure sale), and dismissed the cross-claim of defendant Theodore J. Scheve (the purchaser at the foreclosure sale).

4. D.C.Code § 45–615(b) provides:

    (b) No foreclosure sale under a power of sale provision contained in any deed of trust, mortgage or other security instru-

address it had been given by S & G,[5] stating that Home Federal intended to foreclose the loan by trustee sale on December 2, 1969.[6] The notice of foreclosure sale required by the statute (D.C. Code § 45–615(b)) was also sent to the Recorder of Deeds of the District of Columbia [7] and a copy of said notice was enclosed in the letter to S & G.

The trustees, pursuant to the power of sale contained in the deed of trust and in conformance with the procedure customary in the District of Columbia, at the request of Home Federal, thereafter advertised the forthcoming foreclosure sale in customary form by due and proper notice in the Washington STAR. The advertisement appeared on five separate days in the editions published on November 20, 22, 25 and 28, and December 1, 1969. It is common knowledge that the STAR has a daily circulation in excess of 400,000 and reaches all areas of the Washington Metropolitan Area. Thus over two million separate notices of the forthcoming foreclosure sale were

---

ment, may take place unless the holder of the note secured by such deed of trust, mortgage, or security instrument, or its agent, gives written notice, by certified mail return receipt requested, of said sale to the owner of the real property encumbered by said deed of trust, mortgage or security instrument at his last known address, with a copy of said notice being sent to the Commissioner of the District of Columbia, or his designated agent, at least 30 days in advance of the date of said sale. Said notice shall be in such format and contain such information as the District of Columbia Council shall by regulation prescribe. The 30-day period shall commence to run on the date of receipt of such notice by the Commissioner. The Commissioner or his agent shall give written acknowledgment to the holder of said note, or its agent, on the day that he receives such notice, that such notice has been received, indicating therein the date of receipt of such notice. The notice required by this subsection (b) in regard to said mortgages and deeds of trust shall be in addition to the notice described by subsection (a) of this section (Mar. 3, 1901, 31 Stat. 1274, ch. 854, § 539; June 30, 1902, 32 Stat. 532, ch. 1329; Oct. 12, 1968, Pub.L. 90–566, § 1, 82 Stat. 1002.) On the same date, Home Federal sent the required notice in due form to the Recorder of Deeds for the District of Columbia.

5. The address was:
S & G Investment, Inc.
c/o Mike Golob Association, Inc.
3737 Branch Avenue, Suite 407A
Hillcrest Heights, Maryland 20023

6. The complete letter follows:

October 27, 1969
Re: Loan #92462–3

S & G Investment, Inc.
c/o Mike Golob Association, Inc.
3737 Branch Avenue, Suite 407A
Hillcrest Heights, Maryland 20023

Dear Sirs:
Our records indicate that your account is now three monthly payments in arrears.
We have, therefore, initiated foreclosure action as evidenced by the enclosed notice.
If you wish to avoid further expense and ultimate loss of your property it is imperative that you contact this office immediately.

Sincerely,

/s/ Ralph S. Childs, Jr.
RALPH S. CHILDS, JR.
Vice President

RSC/as
Encl.

---

7. The Recorder of Deeds is the agent of the Commissioner of the District of Columbia for the purposes specified in D.C.Code § 45–615(b), *supra* note 4.

printed, published and distributed to the public in the Washington area prior to the foreclosure sale.

The foreclosure sale took place as scheduled on December 2, 1969, when the property was sold to an innocent purchaser (Scheve). Thereafter he rehabilitated and repaired the property to a substantial extent [8] and later sold it again to another innocent purchaser. Then, just over one year after the foreclosure sale, on December 2, 1970, appellants started this action seeking to set aside the foreclosure sale, or to apply the proceeds of the sale in a different manner, or to obtain a judgment in damages.

■ Appellants' principal claim is that the trustees under the deed of trust violated their fiduciary duty in not attempting to give *personal* notice of the foreclosure sale to *both* the owner of the property (S & G) and the holder of the second trust (Davis Mortgage Company). So far as notice to the owner is concerned, Home Federal fully complied with the statute [9] and there is no reason why the trustees should not be permitted to rely upon such compliance.

■ As for the claim that the trustees, in addition to the published notice in the newspaper, were required to give *personal* notice of the foreclosure sale to the holder of the *second trust,* this is unsupportable as a legal matter. Such notice has never before been required in the District of Columbia and the decided cases are generally to the contrary.[10] While the holder of a second trust in some instances might be a likely bidder at a foreclosure sale under the first trust, the law generally considers that the burden is on the holder of the second trust to keep informed of the status of the first lien.[11] If the holder of the second trust desires notice of a foreclosure sale, he usually so notifies the trustees. This the Davis Mortgage Company, the second lienor, failed to do, even though it was in the investment business and presumably knowledgeable in the field. It also had some indication of the precarious financial condition of S & G as its own note, originally for 90 days, had been frequently extended after payment of interest only, with the last extension being granted on November 13, 1969, while the instant foreclosure was in progress.

■ Moreover, it is completely erroneous for appellants to argue that notice was not given to the holders of the first and second trusts. Both were given constructive notice by virtue of the publication of the customary form of advertisement of the foreclosure sale in the two million copies of the newspaper

---

8. In response to interrogatories Scheve specified the repairs and rehabilitation that he had applied to the property as follows:

5. Porch roof and main roof was coated with roof coating, and repaired, main roof had leaks in several places in front bedroom. Plastering was done on ceilings and walls throughout the house, including almost the entire new ceiling in kitchen and dining rooms. Window sash ropes and glass repaired in many windows. Painted interior and exterior of house. Floors repaired and cleaned. Heating system repaired. Installed new hot water heater. Installed new toilet in basement. Removed old kitchen fixtures in basement. Repaired joists under kitchen floor. Replaced laundry tub waste lines. Repaired basement doors, front and rear, and repaired basement coal bin. Repaired electric plugs and fixtures and installed two individual plugs for air conditioner, plus panel for same. Repaired cracked laundry tubs. Repaired leaking kitchen sink which had been installed improperly. Repaired ceramic tile in bathroom. Installed refrigerator. Constructed retaining wall to divert water from rushing into basement from adjoining property. Repaired termite damage in pantry adjoining kitchen. Removed water from flooded basement about five times. Semi-weekly cleaning and removal of trash from drains in front and rear areaways and yards, grass cutting and daily inspection of the property. Paid gratuities to neighbors to watch property as preventative from vandals. Furnished heat and electric. Trash removal from property.

The foregoing is some indication of the poor condition of the property when he acquired it.

9. Note 4 *supra.*

10. *See* note 18 *infra.*

11. *See* quotation from Glenn on Mortgages, text page 378, *infra.*

printed and distributed by the Washington STAR. Constructive notice is the equivalent of actual notice.[12] In the District of Columbia, publication of a newspaper advertisement is the usual and customary method of giving notice of a foreclosure sale. Such advertisement satisfies the statute [13] and the terms of the deed of trust which provided that the trustees have power

> upon such default, and by request of the Association [Home Federal] to sell said realty, or any part thereof, at public auction in such manner, at such time and place, upon such terms and conditions, and *after such previous advertisement as the said trustees may deem best for the interests of all concerned* . . . .

It would have been better if the owner had actually received the additional personal notice that was properly mailed to S & G, but the failure of S & G to receive it was due partly to its own dereliction and not entirely to Home Federal or to the trustees. Home Federal literally complied with the statutory requirements when it mailed the required letter and notice. In full compliance with the statute, the letter was sent to the *last known address*, correctly addressed to S & G care of Mike Golob Association, Inc.[14] The address is in nearby Maryland and the statute required that the notice be mailed to the address indicated on the envelope. The letter was mailed on October 27, a Monday. This was in sufficient time to have been delivered before Saturday, November 1. S & G moved on November 1. However, the letter was returned stamped "Unclaimed" and a date of "November 14, 1969" was also stamped on the envelope. Also written on the face of the envelope was "NC 10/29/6 3192 Whiting." This notation was not explained.

The reason for the return of the letter is otherwise unexplained and we need not speculate on the reasons since the letter was properly mailed to the proper address as the statute required. S & G had received two prior letters at the same address, the latest on August 1, 1969, calling attention to its delinquency in payments, and S & G had not notified Home Federal of any change of address.

■ The claim now by S & G that the noteholder (Home Federal) and the trustees were somehow deficient in their duties by not being successful in bringing personal notice to S & G overlooks certain facts. First, S & G never notified Home Federal or the trustee of its change of address. Second, S & G was in serious default in its payments, was in the real estate investment business itself and knew that foreclosure was the ordinary consequence of such default. Third, S & G also was on notice that the statute required the lender to send notice of foreclosure to it at its last known address.

■ It must be recognized that D.C. Code § 45–615(b) requires the *noteholder* to mail notice of the sale to the owner at his last known address. Such notice was mailed. Appellants contend that, in addition, the *trustees* must at a minimum satisfy themselves that *actual* notice was given or that reasonable steps were taken to give personal notice. Such would be an erroneous interpretation of the statute and of District law as it would require both the trustees and the noteholder to be responsible for giving such notice. To require both parties to see that notice is given is an absurd

---

12. Butte & Superior Copper Co. v. Clark-Montana Realty Co., 249 U.S. 12, 27, 39 S. Ct. 231, 63 L.Ed. 447 (1919); W.A.H. Church, Inc. v. Holmes, 60 App.D.C. 27, 30, 46 F.2d 608, 611 (1931). The filing of the copy of the notice with the Recorder of Deeds for the District of Columbia also has some elements of constructive notice.

13. D.C.Code § 45–615(a) provides:
   § 45–615. Terms of sale and notice to be given.

(a) If the length of notice and terms of sale are not prescribed by the mortgage or deed of trust, or be not left therein to the judgment or discretion of the mortgagee or trustee, any person interested in such sale may apply to the court, before such sale is advertised, to fix the terms of sale and determine what notice of sale shall be given.

14. Another Golob-owned enterprise.

interpretation of the law and it is clear that section 615(b) does not require it. The fact that the statute was enacted at all indicates that Congress considered that prior thereto there was no obligation on any person in the District of Columbia to give personal notice to the owner, much less to junior lienors. Congress would not have enacted a statute to require noteholders to give notice to owners if trustees were already required to give notice.

As to the interpretation of the statute, it was brought out at the congressional hearings preceding its enactment into law in 1968 that:

> Under present practice [in the District of Columbia] a deed of trust may be foreclosed by the trustees without any prior notice to the unwary homeowner.

Senate hearings, p. 41.[15]

Congress then proceeded to consider the foreclosure procedures in the District of Columbia and after evaluating various proposals it enacted D.C.Code § 45–615(b)[16] which required only that the noteholder should mail notice to the owner and to the Commissioner of the District. No other personal notice to the owner or any subordinate lienor was required. Congress knew from the testimony at the hearings that the prior law did not require personal notice to the owner, and junior lienors would be even less entitled to such notice. Thus, to accede to appellants' contentions would completely change the law in the District of Columbia. Even if most creditors do give personal notice to defaulting debtors, and even to junior lienors in some instances, the validity of the foreclosure and the title conveyed does not depend upon such additional notice. For a great many years in the District of Columbia, the foreclosure of deeds of trust under the power of sale therein has been based upon publicly published advertisement. To now change the law could be upsetting to many titles to real property.

Of course, there are wide variations in the foreclosure laws of the various states, but in the absence of a specific contractual or statutory directive, it is not generally required that a creditor give *personal* notice to a defaulting debtor prior to foreclosure,[17] or to the holder of a second trust.[18] Foreclosure jurisdiction in such cases usually rests on due and proper public advertisement. The statute here requires the noteholder to mail notice to the owner. For the court also to rule, in effect, that both

15. Hearings before Subcommittee on Business and Commerce of the Senate Committee on the District of Columbia, 90th Cong., 1st & 2d Sess. on S. 316, S. 2589, S. 2590, S. 2592, held from December 5, 1967, to February 1, 1968, herein referred to as Senate hearings.

16. 82 Stat. 1002; *see* note 4 *supra*.

17. Certain-Teed Products Corp. v. Sanders, 264 N.C. 234, 141 S.E.2d 329, 333 (1965); Woodell v. Davis, 261 N.C. 160, 163, 134 S. E.2d 160, 163 (1964); Lopez v. Bell, 207 Cal.App.2d 394, 24 Cal.Rptr. 626, 628 (1962) (notice of default had been mailed and returned unopened); Euge v. Blase, 339 S.W.2d 807 (Mo.1960); Lancaster Security Investment Corp. v. Kessler, 159 Cal.App.2d 649, 324 P.2d 634 (1958); Kalin v. Cronig, 328 Mass. 206, 103 N.E.2d 223 (1952); Blanch v. Collison, 174 Md. 427, 199 A. 466 (1938); Grove v. Great Northern Loan Co., 17 N.D. 352, 116 N.W. 345, 347 (1908); Harlin v. Nation, 126 Mo. 97, 27 S.W. 330, 331 (1894); *and see* Logan v. Short, 342 F. Supp. 1349, 1352 (E.D.Mo.1972).

18. Scott v. Paisley, 271 U.S. 632, 635, 46 S. Ct. 591, 592, 70 L.Ed. 1123 (1926):

> In the absence of a specific provision to that effect, the holder of a mortgage or trust deed with power of sale, is not required to give notice of the exercise of the power to a subsequent purchaser or incumbrancer; and the validity of the sale is not affected by the fact that such notice is not given.

Certain-Teed Products Corp. v. Sanders, 264 N.C. 234, 141 S.E.2d 329, 333 (1965); Hrovat v. Bingham, 341 S.W.2d 365 (Mo.App. 1960); Armille v. Lovett, 100 N.H. 203, 122 A.2d 265 (1956) (attaching creditors); DesLauries v. Shea, 300 Mass. 30, 13 N.E.2d 932, 937 (1938); Watkins v. Booth, 55 Colo. 91, 132 P. 1141 (1913); Atkinson v. Washington & Jefferson College, 54 W.Va. 32, 46 S.E. 253, 259–260 (1903); McIver v. Smith, 118 N.C. 73, 23 S.E. 971 (1896); Hardwicke v. Hamilton, 121 Mo. 465, 26 S.W. 342 (1894); Chilton v. Brooks, 71 Md. 445, 18 A. 868 (1889); Carroll v. Kershner, 47 Md. 262, 276 (1877).

the noteholder and the trustees must be responsible for notice to the owner, to use appellants' phrase, "would stand the statute on its end." There is absolutely no reason why the trustees were not perfectly entitled to rely upon the fact that Home Federal would comply with the statute, as it did, by mailing "written notice, by certified mail return receipt requested, of said sale to the owner of the real property encumbered by said deed of trust . . . at his last known address, with a copy of said notice being sent to the Commissioner of the District of Columbia . . . at least 30 days in advance of the date of said sale." D.C.Code § 45–615(b).

Appellants' arguments also overlook the fact that as a practical matter the statutes in the District of Columbia provide that in "actions for foreclosure of . . . deeds of trust" *publication may be substituted for personal service of process upon nonresidents.* D.C.Code § 13–336.[19] Maryland, from which comes much of our jurisprudence in such matters, recognized such constructive notice as far back as 1794. 2 Laws of Maryland (1800) (Kitty), November, 1794, ch. LX, Sec. IX. S & G was a Maryland corporation, at all times had its corporate residence in Maryland and thus was a nonresident of the District of Columbia. So as a matter of practical equity, S & G not only was mailed the notice required by the statute, in the manner required by the statute, but also received by publication the full constructive notice of the foreclosure sale that the statute provided for it as a nonresident.

Appellants suggest that Home Federal or the trustees should have given notice by telephone. This is a novel suggestion in property law—to foreclose mortgages by telephone notice. It is submitted that the trustees were entitled to rely upon what is more usual—service by *mailing* and by publication, which satisfied the statute, the law and the terms of the deed of trust.

## II

The real burr in appellants' contentions is their argument that the trustees were required to give personal notice to junior lienholders of the impending foreclosure sale. In this respect their theory is that a contrary construction of the trustees' obligation would conflict with the recognized duty of a trustee to secure the highest price reasonably obtainable at sale. In support of such contention, appellants urge us to speculate that had the holders of the second trust been notified, "it is likely" that some additional funds would have been available to apply on the second trust. However, since appellees complied with the law, the terms of the trust deed and the statute, it is not open to us to require additional conduct and speculate as to what the results might have been. The force of appellants' argument is for us to change the law.[20] However the law is well stated that:

> The person selling [trustee] is not, when the sale is otherwise regular, required to make any personal effort to procure the attendance of bidders.[21] . . . . It is sufficient if the public

19. D.C.Code § 13–336 provides:
§ 13–336. *Service by publication on nonresidents, absent defendants, and unknown heirs or devisees*
(a) In actions specified by subsection (b) of this section, publication may be substituted for personal service of process upon a defendant who can not be found and who is shown by affidavit to be a nonresident, or to have been absent from the District for at least six months, or against the unknown heirs or devisees of deceased persons.
(b) This section applies only to:
* * * * *
(4) actions for foreclosure of mortgages and deeds of trust;

* * * * *
(6) actions for the enforcement of mechanics' liens, and other liens against real or personal property within the District; and
(7) actions that have for their immediate object the enforcement or establishment of any lawful right, claim, or demand to or against any real or personal property within the jurisdiction of the court.
(Dec. 23, 1963, 77 Stat. 514, Pub.L. 88–241. § 1, eff. Jan. 1, 1964.)

20. Appellants' Brief, 30–43.

21. A trustee under a deed of trust with conventional provisions, such as we have here, is basically a trustee of a power to convey

has been fully advised of the sale by legal publication of notice, and has the right and opportunity to attend and bid.

55 Am.Jur.2d Mortgages § 730 at pp. 662–63, citing Harlin v. Nation, 126 Mo. 97, 27 S.W. 330 (1893). As for the requirement that junior lienors must be served with notice of foreclosure sale of their security, that is not the law.[22] Glenn on Mortgages discusses whether "junior encumbrancers" should be given the same personal notice as the mortgagor when the first lien is foreclosed. He favors such practice—

> *But the rule is otherwise under the cases.* They clearly hold that the mortgagee need not give notice of sale to junior lienors or subsequent grantees, unless he is required so to do by the terms of the power or by statute. The mortgagee is under no duty to notify such a party; on the contrary, it is the latter's business to keep informed as to what is going on with respect to the senior lien.

1 Glenn on Mortgages § 110.1 (1943) (emphasis added).

We thus adhere to the existing law in the District of Columbia and elsewhere that does not generally, except when obligated to do so by the statute, require notice to second lienors when the first lien is foreclosed by advertisement under a power of sale in a deed or mortgage.

It is also plain that when Congress enacted D.C.Code § 45–615(b), it rejected any requirement that holders of second deeds of trust be given personal notice. This was not an idle decision. Congress had before it in the 1968 Senate hearings on S. 2592 the whole panoply of abuses in the foreclosure of deeds of trust in the District of Columbia and it found that serious and flagrant abuses existed in foreclosures by holders of second deeds of trust (and third, etc.). They found no abuses in the foreclosure of first liens. The hearings disclosed that many second (and third, etc.) deeds of trust were given for merchandise purchases and home improvements in which the home owners were defrauded or were charged highly inflated prices. Leaving out the widespread instances where the junior liens were incurred as a result of high pressure salesmanship, fraud, misrepresentation, forgery, false completion certificates, shoddy work and inferior materials that were reflected in the Senate hearings, Congress also received testimony that in addition it was practically the uniform practice for the note and second deed of trust to be transferred *quickly* from the original contractor or vendor to a broker shortly after the transaction, then to be sold and assigned or transferred by him to a foreign or domestic financial institution and finally to end up in some subsidiary

---

title under certain circumstances, *i.e.*, after a forced sale or payment. His powers and duties must be exercised with religious fidelity to ethical principles but his management responsibilities fall short of those, conferred on trustees generally. In Lancaster Security Investment Corp. v. Kessler, 159 Cal.App.2d 649, 324 P.2d 634, 638–639 (1958), the court stated:

> An ordinary trust deed is little more than a mortgage with power to convey. Bank of Italy etc. Ass'n v. Bentley, 217 Cal. 644, 654, 20 P.2d 940. "A trustee under a deed of trust does not assume the important obligations which are in some instances cast upon a trustee by operation of law." Ainsa v. Mercantile Trust Co., 174 Cal. 504, 510, 163 P. 898, 900, and cases cited. The trustee of a trust deed is not a trustee in the strict sense of the word. The role of such a trustee is more nearly that of a common agent of the par-

ties to the instrument. Pacific States Savings & Loan Co. v. North American etc. Co., 37 Cal.App.2d 307, 310, 99 P.2d 355.

While this California case may tend to slightly underemphasize the fiduciary nature of the obligation of trustees under deeds of trust in the District of Columbia, it does point out the limited nature of the powers and duties conferred on trustees by a deed of trust. However, it is well recognized in this jurisdiction that a trustee under a deed of trust owes fiduciary duties both to the noteholder and to the borrower. *See* National Life Ins. Co. v. Silverman, 147 U.S. App.D.C. 56, 454 F.2d 899 (1971); Maynard v. Sutherland, 114 U.S.App.D.C. 169, 174 n. 16, 313 F.2d 560, 565 n.16 (1962); Spruill v. Ballard, 61 App.D.C. 112, 58 F.2d 517 (1932).

22. *See* note 18 *supra*.

corporation. In some instances the note may be sold with recourse and in others without recourse, and the nature and incidence of the transfer were determinative of the identity of the second lienor. Numerous transfers make it difficult to locate and determine the true owner of the second trust, or third, etc. If personal notice were required to be given to junior lienors, we would be imposing on the holder of the prior encumbrance what in many instances would be a difficult burden.

Congress, when it reviewed the subject in 1968, decided not to impose any such requirement. To change the long established law by court decision could be upsetting to existing legal titles. The suggestion that the law be changed or modified to require that notice be given to junior lienors is such a sufficient departure from existing law and practice that it should not be done except by Congress or by the District of Columbia Court of Appeals as the authoritative expositor of local law in the District of Columbia.

Also, if holders of second deeds of trust were required to be notified, on the speculation that a higher price might result, the same logic would require trustees to notify those holding third deeds of trust, fourth deeds of trust, attaching creditors, mechanics lienholders, those with leasehold interests in the property, occupants of the property and owners of contiguous property. Where would the line be drawn? Speculatively, every one of such parties, under proper circumstances, might have an incentive to bid. And if we are going to speculate whether a trustee might have obtained a higher price by notifying any of such persons, will trustees next be required to hire a real estate agent to seek purchases from the general public, or to run an attractive picture of the property in the paper, or to paint the house, or repair it, or change the date of sale to what is al- leged to be a more propitious time? Will it be proper to give notice to such people by telephone as appellants suggest should have been done here to the holder of the second lien? What if the creditor's telephone call is not completed? What if he mistakenly dialed the wrong number? When legal titles to valuable property rights depend upon whether a person could prove that he dialed a correct telephone number in attempting to give notice to a subsequent lienor, property interests will hang by a narrow thread and title insurance costs will skyrocket, or the exceptions in title opinions will as a practical matter render them valueless against particular types of claims. In either event the necessitous borrower will be ill-served—either by higher costs or by less protection. Moreover, if we impose upon trustees the uncertain standards which appellants advocate, foreclosed home owners will suffer since prices received at foreclosure sales will be reduced to reflect the greater hazard to titles.

■ What appellants overlook is that deeds of trust in the District of Columbia are foreclosed in conformance with statute and recognized practice on the basis of *mailed* and *published* notice to the owner, that both such requirements were complied with and that the law here does not, under these circumstances, require personal notice to holders of second deeds of trust. Long established rules affecting property rights should not be changed so precipitously, or in the manner appellants suggest, particularly after Congress refused to make such a change.

### III

■ The circumstances as to the deficiency in price here are not such as to bring the case under our decisions which support setting aside a foreclosure sale because of the inadequacy of the price.[23] Justice Stephens in Jackson v. Fuller, 66 App.D.C. 239, 85 F.2d 816 (1936) con-

---

23. National Life Ins. Co. v. Silverman, 147 U.S.App.D.C. 56, 454 F.2d 899 (1971) ; Orlove v. National Savings & Trust Co., 68 App.D.C. 387, 98 F.2d 259 (1938) ; General Auto Truck Co. v. Rust, 66 App.D.C. 392, 88 F.2d 774 (1936) ; Jackson v. Fuller, 66 App.D.C. 239, 85 F.2d 816 (1936) ; Anderson v. White, 2 App.D.C. 408 (1894).

sidered a case where the price received at the foreclosure sale was approximately 50% of the asserted assessed value of the property and about 38% of the asserted actual value. On such facts his opinion stated:

> We cannot set aside a foreclosure sale on the basis of inadequacy of price alone, unless the inadequacy is such "as to shock the conscience and of itself suggest fraud or misconduct . . . ." [Citing cases] . . . Neither percentage [50% or 38%] can be held in respect of a forced sale shockingly inadequate. . . . [W]here courts have held a sale price so low as to shock the conscience of the court, the discrepancy between the sale price and the value of the property has in most instances been much greater than in the instant case . . . .

66 App.D.C. at 241–242, 85 F.2d at 818–819. Appellants' failure to base their claims on any shocking inadequacy in the foreclosure sale price is thus significant as indicating a deficiency in their cause of action. Monies advanced after the first deed of trust were used to remodel, restore and repair the premises that were in very poor condition. The extent of the work required, taken in conjunction with the relatively modest increase in market value, convinces us that this record does not make a showing of gross inequity that shocks the conscience.[24]

## IV

Appellants also contend that the trustees failed properly to apply the proceeds of the foreclosure sale because the monies they received were applied as if the entire principal indebtedness evidenced by the note secured by the first trust deed had been accelerated (Appellants' Brief 43–51). In other words, appellants' claim that payment of the entire unpaid principal amount of the note was not accelerated and that instead of applying the entire $8,025 received at the foreclosure sale to the satisfaction of the first lien, the trustees should have paid only $355.76 (three months' delinquency) to the first trust holder (Appellants' Brief, 50). If such construction were placed on the foreclosure, the holder of the first deed would give up about 96% of the security for his loan in return for payment of about 4%. His loan thereafter would be totally unsecured.

Appellants refer to the provision of the note which provides that in the

---

24. Mr. Scheve submitted the following answer to one of appellants' interrogatories:

7. Profit $2,430.40.

| | | |
|---|---:|---:|
| Acquisition cost | $8,391.91 | |
| Insurance | 73.00 | |
| Water bills approx. | 36.00 | |
| Approx. interest on bank loans | 800.00 | |
| gas bill, heat and hot water | 100.00 | |
| Electric | 50.00 | |
| 6% sales commission on sale of house | 1,248.00 | |
| 6% commission on purchase | 481.50 | |
| Repairs and improvements | 6,000.00 | $17,180.41 |
| Received from sale | | 19,610.81 |
| Profit | | $2,430.40 |

/s/ Theodore J. Scheve
THEODORE J. SCHEVE

———◆———

Some of these costs were shown on cross examination to be personal estimates of personal services and we would not arrive at exactly the same profit as Scheve computes, but the figures, when coupled with the nature of the "Repairs and improvements" described in note 8, *supra*, are sufficient to demonstrate that this is not a case of gross inequity which shocks the conscience. *See* Orlove v. National Savings & Trust Co., 68 App.D.C. 387, 98 F.2d 259 (1938); Jackson v. Fuller, 66 App.D.C. 239, 85 F.2d 816 (1936).

event of default in any monthly installment payment, "then the whole of the unpaid balance of the indebtedness and any advances, plus interest, and other charges aforesaid, shall immediately become due and payable, at the option of said Association [Home Federal]." The deed of trust also provides "the Association [Home Federal] shall have the right to declare the entire remaining indebtedness . . . immediately due and payable." On the strength of these provisions appellants contend that Home Federal did not properly accelerate the entire unpaid principal. However, there is a further provision in the deed of trust, which deals more specifically with distributing the proceeds of the foreclosure sale. It provides:

> [U]pon compliance by the purchaser with the terms of sale, [the trustees are directed] to convey said property in fee simple and without liability of any purchaser to see to the application of purchase money, and *from the proceeds of sale to pay* the expenses thereof, including an auctioneer's allowance, and a commission of five percentum to the trustees, the expenses, if any, of correcting any irregularity which may appear in the title, counsel fees or other costs expended in and about the protection or execution of this trust including expense of obtaining possession, all money advanced for costs and expenses, or taxes or assessments, or insurance with interest thereon, and all taxes, general and special assessments due upon said land and premises at the time of sale, all other charges, advances, loans, expenses and fees herein provided for, then *the whole amount then remaining unpaid of the principal of the said note, whether the same shall be due or not,* and interest thereon to date of payment, *it being agreed that said note shall, upon sale being made before the maturity of said note, be and become immediately payable at the election of the Association,* and any net surplus

to the borrower, or his heirs or assigns, upon surrender and delivery to the purchaser or purchasers, his or their heirs or assigns, possession of the aforesaid premises so sold and conveyed.

Additionally, we note that the letter which Home Federal sent to S & G by "certified mail, return receipt requested" [25] stated that it had "initiated foreclosure action as evidenced by the enclosed notice" and that appellant was facing the "ultimate loss of [its] property." Considering the value of the property, these remarks are some indication that upwards of $8,000 was being demanded and not $355. More importantly, however, enclosed with the letter of October 27, 1969, was a copy of the notice filed with the Recorder of Deeds on that date, as required by Public Law 90–566 (D.C.Code § 45–615). This was addressed to S & G and, *inter alia,* stated:

> YOU ARE HEREBY NOTIFIED THAT IN ORDER TO SATISFY THE DEBT SECURED BY THE DEED OF TRUST, MORTGAGE OR OTHER SECURITY INSTRUMENT INDICATED BELOW THE REAL PROPERTY DESCRIBED BELOW WILL BE SOLD AT A FORECLOSURE SALE TO BE HELD ON OR AFTER DECEMBER 1, 1969.
>
> \* \* \* \* \* \*
>
> Balance owed on the note: $7,510.46.

This clearly indicated that the "Holder of the note: Home Federal Savings and Loan," was foreclosing "To Satisfy the [$7,510.46] Debt Secured by the Deed of Trust . . . ."

Thus, when we consider the terms of the note with respect to acceleration, the terms of the deed of trust directing the manner of distribution of the proceeds and the notice filed with the Recorder of Deeds, we conclude that the trustees properly applied the proceeds of the foreclosure sale. The commencement of an action for the principal

25. *See* note 6 *supra.*

sum is sufficient in itself to show that the holder exercised its option to accelerate the payment of the principal,[26] and the proceedings to foreclose by advertisement are, for such purpose, the equivalent of an action to foreclose.[27]

It is not necessary in this case to make a determination concerning appellees' alternative claim of laches.[28]

For the foregoing reasons we affirm the judgment of the trial court.

Judgment accordingly.

---

26. Home Fed. S. & L. Ass'n v. LaSalle Nat'l Bank, 130 Ill.App.2d 285, 264 N.E.2d 704, 706 (1970) ; South Dade Farms Inc. v. Atlantic Nat'l Bank, 222 So.2d 275, 277 (Fla. App.1969) ; August Tobler, Inc. v. Goolsby, 67 So.2d 537, 538–539 (Fla.1953) ; Griffith v. White, 259 Ala. 379, 66 So.2d 907, 908 (1953) ; Union Central Life Ins. Co. v. Keith, 58 Idaho 471, 74 P.2d 699 (1937) ; Seligman v. Bisz, 123 Fla. 493, 167 So. 38, 39 (1936) ; Albertina Realty Co. v. Rosbro Realty Corp., 258 N.Y. 472, 180 N.E. 176 (1932) ; Williams v. Gordon, 205 Cal. 590, 271 P. 1070, 1071 (1928) ; Meredith v. Long, 96 Fla. 719, 119 So. 114 (1928) ; Wienke v. Smith, 179 Cal. 220, 176 P. 42, 44 (1918).

27. Heist v. Dunlap & Co., 193 Ga. 462, 18 S.E.2d 837, 840 (1942) ; Delray, Inc. v. Piedmont Inv. Co.. 194 Ga. 319, 21 S.E.2d 420, 422 (1942) ; Redwine v. Frizzell, 184 Ga. 230, 234, 235, 190 S.E. 789 (1937) ; *and see* Sharpe v. Brotzman, 145 Cal.App.2d 354, 302 P.2d 668 (Cal.1956) where a statement attached to a formal notice of foreclosure was held to constitute an exercise of the option to accelerate payment of the entire principal.

28. Appellees also present a strong claim that appellants were guilty of laches in not bringing an action until such time as intermediate transfers of title and costly improvements to the property by a bona fide purchaser made it virtually impossible to set aside the foreclosure sale as against Home Federal and Scheve and thus forced upon the trustees a liability substantially in excess of what they would have been liable for had appellants acted with reasonable promptness. S & G and Golob were in the investment business themselves and thus cannot plead ignorance of foreclosure practices or excuse their long delay. And by asserting that their "primary request for relief is damages against the trustees" (Appellants' Brief, 2), they inferentially recognize that their laches has precluded the granting of any relief against Home Federal, Scheve or the Francies (the eventual purchasers).

On the issue of laches, the following dates are important: The foreclosure sale was publicly advertised in the Washington STAR on November 20, 22, 25, 28 and December 1, 1969 ; Scheve thereafter repaired, painted and improved the property ; appellants' counsel asserted their written claim by letter to Home Federal on August 17, 1970 ; on September 18, 1970, Scheve contracted to sell to the Francies and that sale was settled on November 25, 1970 ; and appellants filed the instant suit on December 2, 1970.

Thus, if appellants had possessed a bona fide cause of action, had they acted more promptly after December 2, 1969, they could have set aside the foreclosure sale and returned the parties to the status quo ante with little or no financial loss to Home Federal, Scheve or the trustees. Instead, appellants stood idly by until August 17, 1970 (8½ months) before they asserted their claims to Home Federal and then waited another 3½ months before they filed their lawsuit. Such delay permitted the foreclosure sale to ripen into transfer of title, permitted the bona fide purchaser at the foreclosure sale to increase the value of the disputed property by making substantial improvements, and permitted sale to another bona fide purchaser for value. These sales to bona fide purchasers and the change in the value of the property precluded setting aside the foreclosure sale and, thus, S & G by its delay impressed upon the trustees a far greater monetary liability than if it had acted more promptly when the situation could have been rectified by a mere return of the property to the status quo ante the foreclosure sale. Such facts constitute all the necessary ingredients of a laches defense. Justice Brewer enunciated the classic definition of laches in Galliher v. Cadwell, 145 U.S. 368, 373, 12 S.Ct. 873, 875, 36 L.Ed. 738 (1892) when he remarked that "laches is not, like limitation, a mere matter of time ; but principally a question of the inequity of permitting the claim to be enforced,—*an inequity founded upon some change in the condition or relations of the property or the parties.*" (Emphasis added.) *See also* Holmberg v. Armbrecht, 327 U.S. 392, 396, 66 S.Ct. 582, 90 L.Ed. 743 (1946) ; O'Brien v. Wheelock, 184 U.S. 450, 493, 22 S.Ct. 354, 46 L.Ed. 636 (1902) ; Penn Mutual Life Ins. Co. v. Austin, 168 U.S. 685, 698, 18 S.Ct. 223, 42 L.Ed. 626 (1898) ; Holgate v. Eaton, 116 U.S. 33, 40, 41, 6 S.Ct. 224, 29 L.Ed. 538 (1885) ; Hayward v. Eliot Nat'l Bank, 96 U.S. 611, 617, 24 L.Ed. 855 (1878). The condition and relation of all the defendant parties, and particularly the trustees, was changed during the delay of appellants and hence appellants would be subject to the consequences of the rule.